UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PATTIE ANN PUSATERI, as Administrator for the Estate of
GREGORY LEE GALLAWAY,

                              Plaintiff,

v.

CITY OF DUNKIRK,
CITY OF DUNKIRK POLICE DEPARTMENT,      Civ. No.: 1:20-cv-00427
CITY OF DUNKIRK POLICE OFFICER
DENISE ZENTZ,
CHAUTAUQUA COUNTY,
CHAUTAUQUA COUNTY SHERIFF
JAMES B. QUATTRONE,
JOHN AND/OR JANE DOE(S) said being
CHAUTAUQUA COUNTY SHERIFF DEPUTIES,
CHAUTAUQUA COUNTY SHERIFF
SERGEANT FULLER,
JOHN AND JANE DOE(S) said being
CHAUTAUQUA COUNTY JAIL PERSONNEL,
ANGELA M. DAMORE, FNP-C,
AMY MEYER, RN,
CHAUTAUQUA COUNTY SHERIFF'S DEPUTY TANNER
DELAHOY bearing Badge Number 5100,
CHAUTAUQUA COUNTY SHERRIFF'S DEPUTY ROBERTS
bearing Badge Number 5108,
CHAUTAUQUA COUNTY SHERRIFF'S DEPUTY ROBERT
BURRELL bearing Badge Number 5060,
CHAUTAUQUA COUNTY SHERRIFF'S SERGEANT
WESTFAHL bearing Badge Number 671,

                              Defendants.

## DECLARATION OF PETER L. VEECH

        I, Peter L. Veech, make this Declaration under the penalties of perjury pursuant to 28 U.S.C. § 1746:

        1.    I am an attorney at law duly licensed to practice in the State of New York and in this Court and am an associate at Webster Szanyi LLP, attorneys for the

Defendants, the County of Chautauqua (the "County"), Chautauqua County Sheriff James B. Quattrone ("Sheriff Quattrone"), Chautauqua County Sheriff's Sergeant Fuller ("Sergeant Fuller"), Chautauqua County Sheriff's Sergeant Westfahl ("Sergeant Westfahl"), Chautauqua County Sheriff's Deputy Tanner Delahoy ("Deputy Delahoy"), Chautauqua County Sheriff's Deputy Roberts ("Deputy Roberts"), Chautauqua County Sheriff's Deputy Robert Burrell ("Deputy Burrell"), Angela Damore, FNP-C ("Damore"), Amy Meyer, RN ("Meyer"), and various John/Jane Doe Defendants (collectively the "County Defendants"), in this action.

2. I am familiar with the facts and circumstances of this litigation, and I make this Declaration in support of the County Defendants' F.R.C.P. 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 24), with prejudice.

3. Attached as **Exhibit A** is the Autopsy Report of Dr. Jay Stahl-Hertz, which is incorporated by reference in the Amended Complaint at Paragraph 71.

4. Collectively attached as **Exhibit B** are the Chautauqua County Jail Suicide Screening Questionnaire, the Chautauqua County Jail Initial Booking Classification Questionnaire, the Chautauqua County Jail Medical Questionnaire, the Chautauqua County Health and Human Services/Jail Division Opiate Withdrawal Assessment and Clinical Opiate Withdrawal Scale, and the Chautauqua County Health and Human Services/Jail Division Provider Orders and Medication Administration Records related to Plaintiff's Decedent, Gregory Lee Galloway ("Galloway"), which are incorporated by reference in the Amended Complaint at Paragraphs 41 through 43.

5. On April 10, 2019, Galloway appeared in Dunkirk City Court, pursuant to an arrest warrant. (Doc. No. 24, ¶ 26).

6. In connection with a pre-existing Drug Treatment Court contract, a drug screen of Galloway was taken on April 10, 2019 by the City of Dunkirk Drug Treatment Court Coordinator, Lee Ann Lazaroney. (*Id*., ¶¶ 27-29).

7. The results of Galloway's April 10, 2019 drug screen were not provided to the County or to the Jail. (*Id*., ¶¶ 30, 33-37; *see also*, Ex. B).

8. None of the County Defendants personally observed Galloway's physical condition at Dunkirk City Court on April 10, 2019. (Doc. No. 24, ¶¶ 26-37).

9. Following his Dunkirk City Court appearance, Galloway was transferred to Dunkirk City lock-up. (*Id*., ¶ 39)

10. No medical attention was provided to Galloway while he remained at Dunkirk City lock-up. (*Id*., ¶ 40).

11. Galloway was subsequently transferred to the Chautauqua County Jail (the "Jail"). (*Id*., ¶¶ 38, 41).

12. After arriving at the Jail, Galloway was promptly screened for medical and psychiatric issues. (*Id*., ¶¶ 41-42; *see also*, Ex. B).

13. On April 10, 2019 at approximately 1:20 p.m., a suicide screen of Galloway was conducted. (Ex. B, pp. 1-3).

14. During the suicide screen, Galloway denied thinking of killing himself or feeling hopeless. (*Id*., p. 2).

15. During the suicide screen, it was noted that Galloway was currently taking Suboxone, Gabapentin, and Alalzapane. (*Id*.).

16. During the suicide screen, Galloway denied that he was suffering from withdrawal symptoms, and it was further noted that Galloway did not appear to be

3

incoherent, disoriented, or under the influence of drugs/alcohol.  (*Id*.).

17. Nonetheless, in an abundance of caution, Galloway was referred to medical/mental health in accordance with the Jail's "withdrawal protocol."  (*Id*.).

18. On April 10, 2019 at approximately 1:24 p.m., a medical questionnaire of Galloway was completed. (*Id*., pp. 4-5).

19. During the medical questionnaire, another list of prescribed medications was elicited from Galloway. (*Id*., p. 4).

20. During the medical questionnaire, Galloway denied that he was in need of immediate medical attention.  (*Id*.).

21. During the medical questionnaire, Galloway also denied having any fever, joint and muscle aches, fatigue, diarrhea, vomiting, stomach pain, lack of appetite, or bleeding.  (*Id*.).

22. During the medical questionnaire, Galloway was further noted to be alert and oriented, not agitated, withdrawn, or sick, and without any obvious signs of need for medical attention.  (*Id*.).

23. On April 10, 2019 at 1:45 p.m., an Opiate Withdrawal Assessment of Galloway was completed.  (*Id*., pp. 8-9).

24. According to Jail policy, an inmate who scores 25 or more on a Clinical Opiate Withdrawal Scale must be immediately placed on constant watch until he or she is re-evaluated.  (*Id*., p. 8).

25. Galloway scored a 7 on his Clinical Opiate Withdrawal Scale.  (*Id*.)

26. Galloway's oxygen saturation was noted to be 98%, his pulse rate was 80, and no tremors were observed.  (*Id*., p. 9).

27. During the Opiate Withdrawal Assessment, Galloway claimed for the first time that he was suicidal. (Doc. No. 24, ¶ 42; *see also*, Ex. B, p. 9).

28. As a result, Meyer informed Sergeant Fuller that Galloway was expressing thoughts of suicide / self-harm. (*Id*.).

29. Galloway then told Sergeant Fuller that he was suicidal. (*Id*.).

30. Galloway did not tell Meyer or Sergeant Fuller that he had ingested a "suicide cocktail" of drugs prior to entering the Jail. (Doc. No. 24, ¶¶ 37, 42; *see also*, Ex. B, p. 9).

31. As a result of Galloway's statements to Meyer and Sergeant Fuller, he was placed in a suicide gown and under suicide watch. (Doc. No. 24, ¶ 52-53; Doc. No. 24-1, p. 6; Ex. B, p. 9).

32. Sergeant Fuller informed Jail personnel that Galloway was being placed on suicide watch. (Doc. No. 24-1, p. 6).

33. On April 10, 2019 at approximately 6:31 p.m., Galloway was transported to cell CS2, where he remained on suicide watch, with Jail staff stationed in close proximity to his cell and constantly checking on Galloway every 10 minutes for signs of self-harm. (Doc. No. 24, ¶ 55, Doc. No. 24-1, pp. 7-8).

34. On April 10, 2019 at approximately 6:40 p.m., 6:50 p.m., 7:00 p.m., 7:10 p.m., 7:20 p.m., and 7:30 p.m., Galloway was noted to be laying on his stomach in his bunk in cell CS2 by Deputy Delahoy. (Doc. No. 24-1, p. 7).

35. On April 10, 2019 at approximately 7:40 p.m., Jail medical staff provided various medications to Galloway in his cell. (Doc. No. 24, ¶¶ 58-59; Doc. No. 24-1, p. 7).

36. On April 10, 2019 at approximately 7:50 p.m., 8:00 p.m., 8:10 p.m., 8:20 p.m., and 8:30 p.m., Galloway was noted to be laying on his right side in his bunk in cell CS2 by Deputy Delahoy. (Doc. No. 24-1, p. 7).

37. On April 10, 2019 at approximately 8:40 p.m., Galloway moved from his right side to his stomach. (*Id*.).

38. On April 10, 2019 at approximately 8:50 p.m., 9:00 p.m., 9:10 p.m., 9:20 p.m., 9:30 p.m., 9:40 p.m., 9:50 p.m., 10:00 p.m. 10:10 p.m., 10:20 p.m., 10:30 p.m., and 10:40 p.m., Galloway was noted to be laying on his stomach in his bunk in cell CS2 by Deputy Delahoy. (*Id*.).

39. On April 10, 2019 at approximately 10:46 p.m., Deputy Robert Burrell assumed Deputy Delahoy's post and monitored Galloway for signs of self-harm every 10 minutes until 1:50 a.m. on April 11, 2019. (Doc. No. 24, ¶ 63-64, Doc. No. 24-1, pp. 7-8).

40. On April 11, 2019 at approximately 1:34 a.m., Sergeant Westfahl visited Galloway's cell to check for signs of self-harm and signed the log book concerning Galloway. (Doc. No. 24, ¶ 67, Doc. No 24-1, p. 8).

41. On April 11, 2019 at approximately 1:50 a.m., Deputy Roberts assumed Deputy Burrell's post and monitored Galloway for signs of self-harm until 1:57 a.m., during which Galloway was again observed to be laying on his stomach on his bunk. (Doc. No. 24, ¶ 64, Doc. No 24-1, p. 8).

42. Deputy Burrell reassumed his post at 1:57 a.m. on April 11, 2019. (*Id*.).

43. Deputy Burrell monitored Galloway for signs of self-harm every 10 minutes from 2:00 a.m. until 4:26 a.m. on April 11, 2019, during which Galloway was

6

again observed to be laying on his stomach on his bunk.  (*Id*.).

44. On April 11, 2019 at approximately 4:26 a.m., Deputy Roberts assumed Deputy Burrell's post and monitored Galloway for signs of self-harm until 4:32 a.m., during which Galloway was again observed to be laying on his stomach on his bunk. (Doc. No 24, ¶ 65, Doc. No. 24-1, p. 8).

45. Deputy Burrell reassumed his post at approximately 4:32 a.m. on April 11, 2019.  (*Id*.).

46. Deputy Burrell monitored Galloway every 10 minutes for signs of self-harm from 4:32 a.m. until 6:00 a.m. on April 11, 2019, during which Galloway was observed to be laying on his stomach on his bunk.  (Doc. No. 24, ¶ 68, Doc. No. 24-1, p. 8).

47. Galloway was unresponsive when Deputy Burrell attempted to wake him at 6:00 a.m. on April 11, 2019.  (*Id*.).

48. The cause, time, and manner of Galloway's death remain undetermined.  (Doc. No. 24, ¶ 71; *see also*, Ex. A).

49. The autopsy of Galloway did not find that he passed away from complications related to "respiratory depression."  (Ex. A, pp. 1-5).

50. The autopsy of Galloway did not find that he passed away from complications related to a seizure.  (*Id*.).

51. The autopsy of Galloway did not find that he passed away from an overdose of illicit or prescription drugs.  (*Id*.).

52. In fact, toxicology testing of Galloway revealed prescribed medications in concentrations that were "not consistent with an acute mixed drug

intoxication that would cause death."  (*Id*.).


Dated:  November 2, 2020

                                                        *s/Peter L. Veech*
                                                        Peter L. Veech