UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

PATTIE ANN PUSATERI, as                     )
Administrator for the Estate of              )
GREGORY LEE GALLAWAY,                        )
                          Plaintiff,         )
                                             )        Case No. 1:20-cv-00427
              v.                             )
                                             )
CITY OF DUNKIRK,                             )
CITY OF DUNKIRK POLICE                       )
DEPARTMENT,                                  )
CITY OF DUNKIRK POLICE OFFICER               )
DENISE ZENTZ,                                )
CHAUTAUQUA COUNTY                            )
CHAUTAUQUA COUNTY SHERIFF                     )
JAMES B. QUATTRONE,                          )
JOHN AND/OR JANE DOE(S) said being           )
CHAUTAUQUA COUNTY SHERIFF                     )
DEPUTIES,                                    )
CHAUTAUQUA COUNTY SHERIFF                     )
SERGEANT FULLER,                             )
JOHN AND/OR JANE DOES(S) said being          )
CHAUTAUQUA COUNTY JAIL                        )
PERSONNEL,                                   )
ANGELA M. DAMORE, FNP-C,                      )
AMY MEYER RN,                                )
CHAUTAUQUA COUNTY SHERIFF'S                   )
DEPUTY TANNER DELAHOY bearing                 )
Badge Number 5100,                           )
CHAUTAUQUA COUNTY SHERIFF'S                   )
DEPUTY ROBERTS bearing Badge                  )
Number 5108,                                 )
CHAUTAUQUA COUNTY SHERIFF'S                   )
DEPUTY ROBERT BURRELL bearing                 )
Badge Number 5060, and                       )
CHAUTAUQUA COUNTY SHERIFF'S                   )
SERGEANT WESTFAHL bearing                     )
Badge Number 671,                            )
                          Defendants.        )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS AND GRANTING LEAVE TO AMEND**
(Doc. 40)

Plaintiff Pattie Ann Pusateri brings claims as the Administrator of the Estate of her
son, Gregory Lee Gallaway (the "Decedent"), arising from the circumstances surrounding
his death while he was a pretrial detainee at Chautauqua County Jail against Defendants
City of Dunkirk ("Defendant City"), City of Dunkirk Police Department ("Defendant
DPD"), City of Dunkirk Police Officer Denise Zentz ("Defendant Zentz"), Chautauqua
County ("Defendant County"), Chautauqua County Sheriff James B. Quattrone
("Defendant Quattrone"), John and/or Jane Doe(s) said being Chautauqua County
Sheriff's Deputies ("Defendant John Doe Deputies"), Chautauqua County Sheriff's
Deputy Sergeant Fuller ("Defendant Fuller"), John and/or Jane Does(s) said being
Chautauqua County Jail Personnel ("Defendant John Doe Jail Personnel"), Angela M.
Damore, FNP-C ("Defendant Damore"), Amy Meyer, RN ("Defendant Meyer"),
Chautauqua County Sheriff's Deputy Tanner Delahoy bearing Badge Number 5100
("Defendant Delahoy"), Chautauqua County Sheriff's Deputy Roberts bearing Badge
Number 5108 ("Defendant Roberts"), Chautauqua County Sheriff's Deputy Robert
Burrell bearing Badge Number 5060 ("Defendant Burrell"), and Chautauqua County
Sheriff's Sergeant Westfahl bearing Badge Number 671 ("Defendant Westfahl").

In her Amended Complaint, Plaintiff alleges the following claims: (1) negligence
against Defendants City, DPD, and Zentz (Count I); (2) violation of the Decedent's
Fourteenth Amendment right to adequate medical care and treatment in violation of 42
U.S.C. § 1983 against Defendants City and DPD (Count II); (3) violation of the
Decedent's Fourteenth Amendment right to adequate medical care and treatment in
violation of 42 U.S.C. § 1983 against Defendant Zentz (Count III); (4) medical
malpractice against Defendants County, Damore, and Meyer (Count IV); (5) negligence
against Defendant County (Count V); (6) violation of the Decedent's Fourteenth
Amendment right to adequate medical care and treatment in violation of 42 U.S.C.
§ 1983 against Defendant County (Count VI); (7) violation of the Decedent's Fourteenth

Amendment right to adequate medical care and treatment in violation of 42 U.S.C.
§ 1983 against Defendants Damore and Meyer (Count VII); (8) negligence under N.Y.
Correct. L. § 500-C against Defendant Quattrone (Count VIII); (9) violation of the
Decedent's Fourteenth Amendment right to adequate medical care and treatment in
violation of 42 U.S.C. § 1983 against Defendant Quattrone (Count IX); (10) violation of
the Decedent's Fourteenth Amendment right to adequate medical care and treatment in
violation of 42 U.S.C. § 1983 against Defendants John Doe Deputies, John Doe Jail
Personnel, and Fuller (Count X); (11) negligence against Defendants Roberts, Delahoy,
Burrell, Westfahl, Fuller, John Doe Deputies, and John Doe Jail Personnel (Count XI);
(12) violation of the Decedent's Fourteenth Amendment right to adequate medical care
and treatment in violation of 42 U.S.C. § 1983 against Defendants Roberts, Delahoy,
Burrell, Westfahl, and Fuller (Count XII); and (13) wrongful death against all Defendants
(Count XIII).

On November 2, 2020, Defendants County, Damore, Delahoy, John Doe Deputies,
John Doe Jail Personnel, Fuller, Meyer, Quattrone, Roberts, Burrell, and Westfahl
("Defendants") moved to dismiss Counts VI, VII, IX, X, XI,[1] and XII with prejudice and
moved to dismiss Counts IV, V, VIII, and XIII without prejudice. Plaintiff filed a
response in opposition on November 30, 2020. On December 14, 2020, Defendants filed
a reply.

Plaintiff is represented by James M. VanDette, Esq., and Vincent Thomas Parlato,
Esq. Defendants are represented by Michael P. McClaren, Esq., Peter L. Veech, Esq., and
Shannon Brae O'Neill, Esq.

**I.    The Amended Complaint's Allegations.**

Plaintiff is a resident of Tonawanda, New York. On or about July 9, 2019, Plaintiff
was granted Letters of Administration by the Surrogate's Court for the County of
Chautauqua, State of New York, authorizing her to pursue the causes of action in her
Amended Complaint in her capacity as the Administrator of the Decedent's Estate.

---

[1] Defendants request dismissal of Count XI with and without prejudice. (Doc. 40-4 at 41.)

Defendant County is a municipal corporation located in New York. Defendant Quattrone was, at all relevant times, the Sheriff of Chautauqua County and was responsible for the day-to-day operations of the Chautauqua County Jail, including the safekeeping of its inmates. Defendants John Doe Deputies, John Doe Jail Personnel, Fuller, Delahoy, Roberts, Burrell, and Westfahl were employees or subordinates of Defendant Quattrone and/or Defendant County and were involved in the supervision of the Decedent while he was in custody of Defendant Quattrone from April 10, 2019 until April 11, 2019. Plaintiff's claims against each of these individual defendants are asserted in their individual and official capacities.

Defendant Damore was, at all relevant times, a Family Nurse Practitioner stationed at the Chautauqua County Jail, and Defendant Meyer was, at all relevant times, a registered nurse employed at the Chautauqua County Jail. Defendants Damore and Meyer were employees or subordinates of Defendant County and were responsible for rendering medical care and treatment to inmates at the Chautauqua County Jail on April 10, 2019. Plaintiff brings claims against Defendants Damore and Meyer in their individual and official capacities.

On April 10, 2019, the Decedent appeared at the Dunkirk City Court in response to a warrant that had been issued as a result of his previous failure to appear in court in a pending criminal case. Prior to the court proceeding, the City of Dunkirk City Court Treatment Court Coordinator, Lee Ann Lazarony,[2] administered a drug screen of the Decedent which was positive for THC, cocaine, benzodiazepine, and Suboxone. The drug screen was done in connection with a February 1, 2018 Drug Treatment Court contract between the Decedent and Dunkirk City Court, the terms of which required the Decedent to abstain from using illegal drugs. Ms. Lazarony advised Dunkirk City Court, in open court and on the record, of the Decedent's positive drug screen results and advised the

---

[2] Ms. Lazarony's surname is spelled Lazaroney in the Amended Complaint, it is the court's understanding that "Lazarony" is the correct spelling. *See* http://ww2.nycourts.gov/courts/8jd/Chautauqua/dunkirk.shtml (listing "Lee Ann Lazarony" as the Dunkirk City Court, Chautauqua County treatment court coordinator).

4

court that he had tested positive for drug use at least three times within the last year.

At the hearing, Ms. Lazarony stated on the record: "I am concerned for his safety and well-being, Your Honor." (Doc. 24 at ¶ 33) (internal quotation marks omitted). The Decedent's cousin, Christine Kaiser, also appeared at the hearing and advised an on-duty DPD officer at the Dunkirk City Court that the Decedent was not well and in need of medical attention. As a result of the Decedent's positive drug screen, the Dunkirk City Court remanded the Decedent to the ultimate custody of Defendant Quattrone at the Chautauqua County Jail, subject to return on April 25, 2019 for further disposition.

In the courtroom, the Decedent was allegedly observed holding his head against a wall for support, having difficulty walking, and falling on top of Ms. Kaiser when attempting to embrace her. On that same day, at approximately 10:00 a.m., Ms. Kaiser described the Decedent's mental and physical condition to Plaintiff, prompting Plaintiff to call Defendant DPD and speak with Defendant Zentz. During that call, Plaintiff informed Defendant Zentz of what she had learned about the Decedent's condition and told Defendant Zentz that she was concerned that the Decedent would die if he did not receive immediate medical treatment because he had likely taken a "suicide cocktail" of drugs. *Id.* at 12, ¶ 37. Defendant Zentz allegedly responded that the Decedent was "fine." *Id.*

Upon being remanded into custody, the Decedent became a pretrial detainee of Defendant City and/or Defendant DPD. Following his appearance at the Dunkirk City Court, the Decedent was transported to the Dunkirk City lock-up, where he remained in the custody of Defendant City until transferred to the custody of Defendant Quattrone, who oversees the Chautauqua County Jail.

Plaintiff alleges that, while he was in the custody of Defendant City, the Decedent's condition was "clear, observable, and apparent" to Defendants City and DPD by and through their employees and other subordinates. *Id.* at 13, ¶ 40. At approximately 1:24 p.m., a Chautauqua County Jail questionnaire (the "Questionnaire") was completed for the Decedent wherein it was noted that he was a "'high risk for 'medical' and psychiatric.'" *Id.* at 13, ¶ 41. Responses to the Questionnaire included that the Decedent

5

was taking the following medications: "'Kep[p]ra, [o]lanzap[i]ne, [g]abapentin, Wel[l]butrin,' and '[a]mitript[y]line CVS Brooklyn Square.'" *Id.* The Questionnaire further noted that the Decedent was receiving treatment for a medical condition, mental health treatment, and had taken Suboxone within the last forty-eight hours. The Questionnaire was signed by Defendant Meyer on April 12, 2019.

At approximately 1:45 p.m., Defendant Meyer completed a Chautauqua County Health and Human Services/Jail Division Opiate Withdrawal Assessment (the "Opiate Withdrawal Assessment") wherein the following narrative is set forth:

> Inmate seen for Suboxone w/d Inmate takes 12mg QD. Inmate lethargic & slurring words. Inmate first admits to meth use, then denies. Inmate then states he had a dirty urine . . . multiple drugs. Inmate argumentative . . . staff & blaming medical for not getting his meds. Inmate stated he was suicidal, but when this writer phoned Sgt Fuller inmate began yelling "She's lying." Sgt Fuller spoke [with] inmate. Inmate stated he would try to kill himself just for spite. Inmate asked if he attempted suicide would he be removed from [constant watch]. Inmate then removed from medical and taken to booking for [constant watch].

(Doc. 24 at 14, ¶ 42) (first alteration in Amended Complaint).

At approximately 2:00 p.m., Defendant Damore ordered "Keppra 500 milligrams po BID," which Plaintiff alleges means to be taken by mouth twice per day, and "Olanzapine 10 milligram QHS," an antipsychotic drug. *Id.* at 24 at 14, ¶ 43 (internal quotation marks omitted). Defendant Meyer allegedly received and noted this order.

Plaintiff alleges that Keppra was never administered to the Decedent and further alleges that, upon information and belief, the Decedent had prior seizures in the Chautauqua County Jail, including in 2018, and was at high risk for another seizure without Keppra. Defendants Damore and Meyer allegedly knew or should have known that polysubstance intoxication or indications could cause respiratory depression and increased risk of death as well as increasing the risk of seizure death due to respiratory depression. Plaintiff alleges that Defendant Damore ordered olanzapine while the Decedent was experiencing polysubstance intoxication and that Defendant Damore and/or Defendant Meyer administered that drug to the Decedent. The administration of

6

olanzapine, in combination with the multiple substances which the Decedent took before incarceration, allegedly further depressed the Decedent's respiratory function.

Plaintiff alleges, upon information and belief, that medical staff at the Chautauqua County Jail, including Defendants Damore and Meyer, were familiar with the Decedent's medical and psychiatric file and/or records as well as his prescription medications from the Decedent's prior incarceration. Plaintiff alleges this includes familiarity with the Decedent's previously recorded "high risk factors" including "medical and psychiatric risks" and "diagnosed . . . bipolar disorder, anxiety, depression and seizures, anger management issues, mood swings, paranoia, panic attacks, inability to concentrate while communicating, poor focus and attention, in addition to substantial substance abuse issues." *Id.* at 15-16, ¶ 51.

Following the Opiate Withdrawal Assessment, the Decedent was placed in a suicide gown and was under constant supervision, also known as "constant watch[.]" *Id.* at 16, ¶ 53 (internal quotation marks omitted). Plaintiff contends that according to Defendant Quattrone's and/or Defendant County's policies, constant watch required that staff maintain uninterrupted visual observation of the Decedent and continuous and direct supervision by permanently occupying an established post in close proximity to the Decedent. These alleged policies further required that staff maintain a continuous clear view of the Decedent so as to allow them to intervene immediately and directly in response to situations or behavior observed which threatened the health or safety of prisoners or good order of the facility.

At approximately 6:30 p.m., the Decedent was transported to a cell marked "CS2[,]" where he remained until the following morning. At approximately 7:40 p.m. on April 10, 2019, the Decedent was given medications, including clonidine, a blood pressure medication; Imodium, a diarrhea medication; and olanzapine. He was not administered Keppra despite it being ordered. Upon information and belief, this was the last time any medical treatment was rendered to the Decedent until he was discovered unresponsive the following morning.

On April 10, 2019, beginning at approximately 6:30 p.m., Defendant Delahoy

monitored the Decedent at a constant watch post outside cell CS2, noting "subject lays on his stomach, on his bunk," from 8:40 p.m. until 10:46 p.m., allegedly without periodically checking for signs of life. *Id.* at 19, ¶ 62. At 10:46 p.m., Defendant Burrell assumed the post outside CS2 for constant watch until April 11, 2019 at 6:05 a.m. For the entirety of his shift, Defendant Burrell noted at ten-minute intervals: "subject laying on bunk on his stomach[.]" *Id.* at 19, ¶ 63 (alteration in original). Plaintiff alleges that Defendant Burrell did not maintain a constant watch with an uninterrupted or unobstructed clear view at all times of the Decedent and did not periodically check to verify his signs of life.

From 1:50 a.m. until 1:57 a.m. on April 11, 2019, Defendant Burrell was relieved for a break and the post outside CS2 was assumed by Defendant Roberts. Defendant Roberts noted "subject laying on bunk on his stomach[.]" (Doc. 24 at 20, ¶ 64) (alteration in original). Defendant Roberts provided Defendant Burrell break coverage from 4:26 a.m. until 4:32 a.m. on April 11, 2019, and again noted "subject laying on his bunk on his stomach[.]" *Id.* at 20, ¶ 65 (alteration in original). Neither entry indicates that Defendant Roberts attempted to verify the Decedent's signs of life.

From April 10, 2019 at 10:56 p.m. until approximately 6:09 a.m. on April 11, 2019, Defendant Roberts conducted supervisory visits of the cells, including the Special Housing Unit. During these visits, Defendant Roberts allegedly did not inquire about or undertake to verify for himself the Decedent's signs of life. Defendant Roberts had been advised or briefed on the Decedent's supervision or monitoring requirements as well as Defendant Fuller's order to place the Decedent in a suicide gown. Defendant Westfahl also allegedly made supervisory visits and checked the logbook while the Decedent was in cell CS2 and at no time verified his signs of life.

On April 11, 2019, at approximately 6:00 a.m., the Decedent was found unresponsive in his cell. During the Decedent's time in cell CS2, Defendant Quattrone's deputies, Defendants Delahoy, Roberts, Burrell, Westfahl, Fuller, John Doe Deputies, John Doe Jail Personnel, and others were stationed outside to conduct supervision.

Plaintiff alleges that despite the Decedent's high-risk assessment, suicide threats, and apparent incapacitation due to drugs, he was not examined by a jail physician.

8

Plaintiff alleges that the Decedent had been deceased for a period of several hours prior to being discovered.

On April 11, 2019, the Office of Erie County Medical Examiner's Jay Stahl-Herz, MD, performed an autopsy on the Decedent, noting that he was found face down on the mattress of his jail cell, that he had a history of polysubstance abuse, and that the cause and manner of death were undetermined. Dr. Stahl-Herz noted a "possibility of toxicity due to an as yet unidentified substance consumed before entry into jail cannot be excluded." *Id.* at 22, ¶ 71.

While the Decedent was under constant watch, Defendant Quattrone's staff and subordinates, including, but not limited to, Defendants Delahoy, Roberts, Burrell, Westfahl, Fuller, John Doe Deputies, and/or John Doe Jail Personnel, allegedly failed to, among other things, visually observe the Decedent without interruption at a post in close proximity to him; note his activities every fifteen minutes in a logbook; and verify the Decedent's signs of life, including movement or audible speech, breathing, or snoring. In addition, Defendant Quattrone allegedly negligently failed to train, supervise, and retain Defendants Delahoy, Roberts, Burrell, Westfahl, Fuller, John Doe Deputies, and/or John Doe Jail Personnel.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

To survive a motion to dismiss filed pursuant to Fed R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)

9

(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

### B.   Whether Plaintiff Plausibly Pleads Proximate Cause.

Defendants contend that Plaintiff's § 1983 claims as well as Counts IV, V, VIII, and XIII must be dismissed against them based on a failure to plausibly allege proximate cause. In support of this contention, Defendants assert that: (1) the toxicology report did not show lethal levels of prescription or illicit drugs; (2) Plaintiff fails to allege facts that any Defendant actually knew of the Decedent's risk of polysubstance complications, including respiratory depression; and (3) the Amended Complaint contains no plausible facts "suggesting that [the Decedent] was placed 'on watch' for any reason other than his own threats of self-harm." (Doc. 40-4 at 22.)

To bring a claim under § 1983, "[a] defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights." *Rahman v. Fisher*, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009); *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999) ("A § 1983 action, like its state tort analogs, employs the principle of proximate causation."). "Where the causal connection is 'too tenuous,' the constitutional deprivation is not the proximate cause of actual injury." *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 268 (E.D.N.Y. 2014) (quoting *Phillips v. City of New York*, 871 F. Supp. 2d 200, 206 (E.D.N.Y. 2012)). "[Q]uestions relating to proximate cause are normally questions of fact[.]" *Id.* (internal quotation marks omitted).

Defendants argue that the Decedent's death is not traceable to any violations of his civil rights because a statement in the Autopsy Report[3] precludes Plaintiff from arguing that the Decedent died from a failure to administer Keppra, respiratory depression due to improper administration of olanzapine, or respiratory depression due to polysubstance intoxication. Because the Autopsy Report does not determine a cause of death, it also does not foreclose the possibility that Plaintiff's claimed causal factors were a proximate cause of the Decedent's death. The Autopsy Report alone is therefore insufficient to render Plaintiff's causation claims implausible. *See Page v. Monroe*, 300 F. App'x 71, 75 (2d Cir. 2008) ("It is axiomatic that proximate cause ordinarily is a question to be determined by the finder of fact.") (internal quotation marks omitted) (quoting *Decker v. Forenta LP*, 736 N.Y.S.2d 554, 555 (N.Y. App. Div. 2002)). This conclusion is underscored by the Autopsy Report's finding that the Decedent had ingested "*prescribed medications* in concentrations that are not consistent with an acute mixed drug intoxication that would cause death[,]" (Doc. 40-2 at 5) (emphasis supplied), while recognizing a "possibility of toxicity due to an as yet unidentified substance consumed before entry into jail[.]" (Doc. 24 at 22, ¶ 71) (internal quotation marks omitted).

Defendants further contend that Plaintiff fails to allege that any of them actually knew of the Decedent's risk of polysubstance complications, including respiratory

---

[3] Defendants cite the following statement from the Autopsy Report:

> Toxicology testing revealed prescribed medications in concentrations that are not consistent with an acute mixed drug intoxication that would cause death. Vitreous chemistries were within normal limits. Microscopic examination of tissues was unremarkable . . . . Following a thorough investigation, the cause and manner of death for this decedent remain undetermined. . . . The possibility of toxicity due to an as yet unidentified substance consumed before entry into jail cannot be excluded.

(Doc. 40-2 at 5.) Although Plaintiff did not include the Autopsy Report as an attachment to her Amended Complaint, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint[.]" *Sira v. Morton*, 380 F.3d 57, 66 (2d Cir. 2004) (citations and internal quotation marks omitted). Because Plaintiff references the Autopsy Report in her Amended Complaint, it is properly considered on a motion to dismiss. *Id.*

depression, and there is no basis to impute to them knowledge that the Decedent had ingested lethal doses of drugs prior to entering the jail. Defendants argue that Plaintiff alleges that information was given only to Defendants DPD and Zentz.

In her Amended Complaint, Plaintiff alleges that upon the Decedent's arrival at the Chautauqua County Jail, the Questionnaire as well as the Opiate Withdrawal Assessment were completed and Defendant Meyer noted that the Decedent had ingested Suboxone within the last forty-eight hours, admitted to using methamphetamine, said that he had "a dirty urine" from a mix of drugs, and reported that he was suicidal. (Doc. 24 at 14, ¶ 42.) Even if, as Defendants argue, they did not know that hours earlier the Decedent's drug screen was positive for THC, cocaine, benzodiazepine, and Suboxone and that Ms. Lazarony, Mr. Kaiser, and Plaintiff had each expressed concerns regarding the Decedent's health and well-being, Plaintiff has plausibly alleged that Defendant Meyer was aware of the Decedent's ingestion of multiple substances through the Questionnaire and Opiate Withdrawal Assessment and that the remaining Defendants knew that the Decedent was a "high medical and psychiatric risk[][.]" (Doc. 24 at 27-28, ¶ 92.) These facts are sufficient at the pleading stage to support a claim that Defendants were on notice of the risk of death or serious harm from polysubstance abuse.

Finally, although Defendants assert that it is uncontested that the Decedent was placed on constant watch because of his threats of self-harm, a single record[4] does not negate the existence of other causal factors in the Decedent's death nor does it negate Defendants' knowledge of those causal factors. *See Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998).

Accepting Plaintiff's allegations as true, although a close question, she has plausibly pled a proximate causal connection between Defendants' alleged deprivation of the Decedent's constitutional right to adequate medical treatment and safe conditions of confinement and the Decedent's death. Defendants' motion to dismiss on Counts IV, V, VI, VII, VIII, IX, X, XII, and XIII for failure to plausibly plead proximate cause is

---

[4] *See* Doc. 24-1 at 6 ("[P]er Sgt. Fuller, subject on watch, subject made threats to harm . . . himself[.]").

therefore DENIED.

###### C.   Whether Plaintiff Plausibly Pleads a *Monell* Claim Against Defendant County.

To state a claim for deliberate indifference to serious medical needs pursuant to 42 U.S.C. § 1983, a pretrial detainee must allege: "(1) objectively, the deprivation the [detainee] suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . . , such as deliberate indifference to [detainee] health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (alterations in original) (internal quotation marks and citation omitted).

A municipality can be liable under § 1983 "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "A plaintiff may satisfy the 'policy, custom or practice' requirement [of a *Monell* claim] in one of four ways[,]" *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010), by alleging:

> (1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees[.]

*Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019) (citations and internal quotation marks omitted) (alterations adopted). "[A] plaintiff also must establish an 'affirmative' causal link between the municipality's policy, custom, or practice and the alleged constitutional injury." *Dumel v. Westchester Cnty.*, 2021 WL 738365, at *5 (S.D.N.Y. Feb. 25, 2021).

Defendant County asserts that Plaintiff has failed to state a *Monell* claim against it because she has not plausibly alleged that the constitutional violation was caused by its official "policy or custom," nor has she plausibly alleged a failure to train or supervise. Plaintiff responds that Defendant County maintained a deficient formal constant watch

policy, permitted practices of inmate neglect that were so widespread as to constitute a custom or policy, did not have a jail physician, and failed to train and supervise subordinates regarding medical and psychiatric care and treatment. With regard to a formal policy, Plaintiff alleges that Defendant County's policies required "uninterrupted visual observation [of the Decedent], and continuous and direct supervision by permanently occupying an established post in close proximity to [the Decedent]," (Doc. 24 at 16, ¶ 54), which Plaintiff contends was constitutionally deficient because Defendant County's staff were not required to verify the Decedent's signs of life during constant watch. She points out that New York Commission of Correction standards mandate that correctional staff "periodically check to verify signs of life," (Doc. 50-8 at 18), and further asserts "as a result of the deficient written policies of [Defendant County] . . . [D]ecedent, . . . was in fact deprived of access to adequate medical care and treatment[.]" (Doc. 24 at 33, ¶ 114.)

A violation of prison policy does not, alone, give rise to a claim under § 1983. *See Joseph v. Marche*, 2019 WL 1172382, at *4 (W.D.N.Y. Mar. 13, 2019) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim[.]") (citing *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)). Moreover, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (footnotes omitted). In this case, an allegedly deficient policy to verify signs of life during constant watch in a single case, without more, will not suffice to state a claim of municipal liability under *Monell*. *Id.* Plaintiff's *Monell* claim based on a failure to train or supervise is similarly deficient.

To plead a *Monell* claim based on a failure to train or supervise, a plaintiff must plead (1) that "a policymaker knows 'to a moral certainty' that her employees will confront a given situation[,]" (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there

is a history of employees mishandling the situation[,]" and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). As the Second Circuit has observed:

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise]. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training [or supervision] is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citations omitted).

"Merely alleging that Defendants failed to institute adequate procedures is not enough to survive dismissal. Such a failure must first rise to the level of deliberate indifference to be actionable." *Hardy v. Erie Cnty.*, 2012 WL 1835624, at *3 (W.D.N.Y. May 18, 2012). With regard to a failure to train or supervise claim, "when [municipal] policymakers are on actual or constructive notice that a particular omission in their training program causes [municipal] employees to violate citizens' constitutional rights, the [municipality] may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61 (citations omitted). Correspondingly, a failure to train or supervise evinces a municipal custom or policy only where decision-makers adopt an "approach that they know or should know has failed to prevent tortious conduct by employees[.]" *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997).

A single instance of allegedly unconstitutional conduct is generally insufficient to impose *Monell* liability. *See Tuttle*, 471 U.S. at 831 ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the [County] liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.") (J. Brennan,

concurring); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 14 (2d Cir. 2015) (affirming a dismissal of a plaintiff's *Monell* claim for deliberate indifference to serious medical needs because "the amended complaint provides only one additional example of a similar incident"); *Jones*, 691 F.3d at 85 (finding that the plaintiff showed "two instances, or at the most three" cases of unconstitutional conduct by a "small number of officers" that occurred "over a period of several years[,]" which "fell far short of showing a policy, custom, or usage of officers" or conduct "so persistent that it must have been known to supervisory authorities"). Because Plaintiff's failure to train and supervise allegations are based on a single incident, she has not plausibly pled that Defendants had "notice that [the] course of training [and supervision were] deficient[.]" *Connick*, 563 U.S. at 1360.

For the foregoing reasons, because Plaintiff fails to plausibly allege a *Monell* claim based on Defendant County's alleged deficient constant watch policy or based on a failure to train or supervise, Defendant County's motion to dismiss Count VI is GRANTED.

### D.  Whether Plaintiff's § 1983 Official Capacity Claims Should be Dismissed as Redundant.

Defendants assert that Plaintiff's official capacity § 1983 claims against Defendants Fuller, Westfahl, Damore, Meyer, Delahoy, Roberts, Burrell, John Doe Deputies, and John Doe Jail Personnel, as set forth in Counts VII, X, and XII of the Amended Complaint, are redundant because "[s]uits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The court agrees.

"Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 213 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010)).

Defendants' motion to dismiss Plaintiff's official capacity § 1983 claims in Counts VII, X, and XII against Defendants Fuller, Westfahl, Damore, Meyer, Delahoy, Roberts, Burrell, John Doe Deputies, and John Doe Jail Personnel as redundant is GRANTED.

**E.    Whether Plaintiff Plausibly Pleads a Deliberate Indifference Claim Against Defendants Damore and Meyer.**

Defendants assert that Plaintiff's deliberate indifference claim against Defendants Damore and Meyer is indistinguishable from her negligence and medical malpractice claims against them and is unsupported by plausible factual allegations that these Defendants acted with the requisite state of mind. Plaintiff responds that Defendants Damore and Meyer knew or should have known that there was a high risk to the Decedent's health and safety due to his polysubstance intoxication and medical history which could lead to an increased risk of seizure and/or death.

> [T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively.

*Darnell*, 849 F.3d at 35.

Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind[.]" *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective component requires that "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted).

"Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (quoting *Chance v. Armstrong*, 143 F.3d 698,

703 (2d Cir. 1998)). As a result, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment[.]" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (applying the Eighth Amendment).

Plaintiff alleges that Defendant Meyer knew or should have known that the Decedent's condition posed a high risk of death or serious bodily injury because she completed the Questionnaire and conducted an Opiate Withdrawal Assessment in which the Decedent was slurring his words and was lethargic; said he had "a dirty urine"; stated that he was suicidal; and had used a number of illegal drugs. (Doc. 24 at 14, ¶ 42.) Following Defendant Meyer's completion of the Opiate Withdrawal Assessment, the Decedent was placed in a suicide gown under constant watch, which Plaintiff argues was a wholly insufficient and reckless response based on the Decedent's multiple risk factors. At the pleading stage, although a close question, this is sufficient to state a claim of deliberate indifference. *See Iacovangelo*, 624 F. App'x at 13 (finding that the plaintiff had plausibly alleged the defendant recklessly failed to act with reasonable care when "[the decedent] admitted to the daily use of drugs . . . , that she had a history of drug and alcohol abuse, and that she acknowledged being under the influence of drugs at the time of her admission to jail").[5]

In contrast, Plaintiff does not allege that Defendant Damore was provided with the Questionnaire or the Opiate Withdrawal Assessment, nor does she allege Defendant Damore personally examined the Decedent. Instead, Defendant Damore's role appears to be confined to prescribing medications for the Decedent and possibly administering them. Plaintiff's cursory allegation that Defendant Damore was familiar with the Decedent's

---

[5] *See also Gabriel v. Cnty. of Herkimer*, 889 F. Supp. 2d 374, 396 (N.D.N.Y. 2012) (observing that "the alleged deprivations—particularly the failure to notice symptoms of drug intoxication and the failure to provide . . . medical treatment—were 'sufficiently serious' deprivations, creating a risk of 'death, degeneration, or extreme pain'") (citations omitted); *Stojcevski v. Cnty. of Macomb*, 2019 WL 4744432, at *12 (E.D. Mich. Sept. 30, 2019) (holding that "[a] reasonable jury could . . . conclude that reliance on an individual at risk for polysubstance abuse to self-report his or her worsening condition constitutes deliberate indifference").

medical history based on his prior incarceration presupposes a physician's recall of the medical history of each person under his or her care. *See Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (holding a court may dismiss a claim if the "well-pleaded facts" are nonetheless implausible). Plaintiff does not further allege that Defendant Damore reviewed the Decedent's medical records before prescribing him medications. In any event, as Defendants point out, the Autopsy Report concludes prescribed medications did not cause the Decedent's death.

Although discovery may yield additional information regarding Defendant Damore's knowledge of the Decedent's condition, it is not presently set forth in the Amended Complaint. The Amended Complaint therefore does not plausibly allege that Defendant Damore "knew or should have known" that the medications she prescribed to the Decedent objectively "posed an excessive risk to [his] healthy and safety." *Darnell*, 849 F.3d at 35. Because Plaintiff's § 1983 claim against Defendant Damore does not plausibly allege deliberate indifference, it is more properly characterized as a negligence claim, which is not actionable under § 1983.[6]

For the reasons stated above, Defendants' motion to dismiss Count VII, deliberate indifference to the Decedent's serious medical needs, is DENIED as to Defendant Meyer and GRANTED as to Defendant Damore.

### F.    Whether Plaintiff Plausibly Pleads Defendants' Personal Involvement Under § 1983 and that Defendants Acted with the Requisite State of Mind.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Stated differently, a plaintiff "must . . . establish that [a defendant] violated" the Eighth Amendment by his or her own conduct, "not by reason of [his or her] supervision of others who committed the violation. [A plaintiff] must show

---

[6] *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (holding a plaintiff must establish "something more than mere negligence" to establish deliberate indifference under the Fourteenth Amendment) (internal quotation marks and citation omitted).

that [the defendant] herself 'acted with deliberate indifference'—meaning that [the defendant] personally knew of and disregarded an excessive risk to [the Decedent's] health or safety." *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (internal quotation marks omitted). The Second Circuit has observed that while "there is no special rule for supervisory liability[,] . . . '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id.* at 618.

In *Darnell*, the Second Circuit explained that, in contrast with Eighth Amendment deliberate indifference claims, an official can "violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Darnell*, 849 F.3d at 35. However,

> the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively.

*Id.*

Plaintiff's allegations against Defendant Quattrone are limited to his promulgation of deficient policies, permitting unlawful acts which amounted to a custom or policy, and failing to train his subordinates. Plaintiff does not further allege that Defendant Quattrone was personally involved in a constitutional violation or even that he had any personal contact with the Decedent. Defendants' motion to dismiss Count IX against Defendant Quattrone in his individual capacity is therefore GRANTED.

Defendants assert that Plaintiff's individual capacity deliberate indifference claims against Defendants Fuller, Westfahl, Delahoy, Burrell, and Roberts must also be dismissed because they only knew of a risk of suicide and were unaware of the Decedent's risk of death from polysubstance intoxication or respiratory depression.

Defendants argue that Plaintiff further fails to plausibly allege that these individuals acted with the requisite state of mind.

Plaintiff's allegations of deliberate indifference against Defendants Fuller, Westfahl, Delahoy, Burrell, and Roberts include that each was posted outside the Decedent's cell during the period of constant watch and failed to verify the Decedent's signs of life. She has therefore plausibly alleged personal involvement. Plaintiff does not, however, further allege that Defendants knew that the Decedent was at risk for overdose, only that he was a "known medical and psychiatric risk, as evidenced by the fact that . . . he . . . had been placed in a suicide gown and in cell CS2 under constant supervision or constant watch." (Doc. 24 at 42-43, ¶ 140.) "[I]n general, . . . deliberate indifference [is] lacking where officers take affirmative and reasonable steps to protect detainees from suicide." *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009). Here, even though the Decedent was placed in a suicide gown, Plaintiff does not assert Defendants Fuller, Westfahl, Delahoy, Burrell, and Roberts were aware of any other specific risks of harm and intentionally or recklessly disregarded them, nor does she plausibly allege that they acted with the requisite state of mind.

Defendants' motion to dismiss § 1983 claims against Defendants Fuller, Westfahl, Delahoy, Burrell, and Roberts for failure to allege that they acted with the requisite state of mind is therefore GRANTED.[7]

### G.    Whether Defendant Meyer is Entitled to Qualified Immunity.

Defendant Meyer contends she is entitled to qualified immunity because her conduct did not violate a clearly established right. "The doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (S.D.N.Y. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court must determine:

---

[7] Because the individual capacity claims against these Defendants under § 1983 are dismissed, the court does not address whether their dismissal is also appropriate pursuant to the doctrine of qualified immunity.

"(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Id.*

> Although, "usually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted," a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint."

*Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015) (quoting *McKenna v. Wright*, 386 F.3d 432, 435-36 (2d Cir. 2004)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Vega v. Semple*, 963 F.3d 259, 274 (2d Cir. 2020) (internal quotation marks and citation omitted). It is understood that this analysis is undertaken to "ensure that the official being sued had fair warning that his or her actions were unlawful." *Id.* (internal quotation marks omitted).

Plaintiff alleges that Defendant Meyer violated the Decedent's constitutional rights through deliberate indifference to his medical needs, resulting in the Decedent's untimely death. Defendant Meyer conducted the Opiate Withdrawal Assessment with the Decedent, who informed her, among other things, that he was suffering withdrawal from Suboxone, may have ingested methamphetamine, had "a dirty urine" from multiple substances, and was considering suicide. (Doc. 24 at 14, ¶ 42.) She also signed the Questionnaire, which indicated Plaintiff was taking four prescriptions including Keppra and Olanzapine. These documents arguably placed her on notice of the potential for serious bodily injury or death for reasons beyond self-harm.

Because a right to adequate medical care is clearly established, *see Estelle*, 429 U.S. at 104, and because Plaintiff plausibly pleads a constitutional violation and Defendant Meyer's personal involvement, the court must await a factual record to

evaluate Defendant Meyer's qualified immunity claim. Defendant Meyer's motion to dismiss claims against her on the basis of qualified immunity is therefore DENIED.

### H.   Whether Plaintiff Plausibly Pleads Negligent Training, Supervision, and Retention Claims Against Defendants County and Quattrone.

Defendants argue that Plaintiff's negligent training, supervision, and retention claims against Defendants County and Quattrone fail because Plaintiff has not alleged that those Defendants' subordinates acted outside the scope of their employment or had a propensity for the conduct alleged and because Defendant County is not vicariously liable for the acts of Defendant Quattrone's subordinates.

Under New York law, "[w]here the acts of 'employees' are concerned, an employer can be held vicariously liable under principles of *respondeat superior* for acts committed *within* the scope of the employee's employment, or may be held directly liable for 'negligent hiring, retention, or supervision' for acts committed *outside* that scope." *Ben v. United States*, 160 F. Supp. 3d 460, 476 (N.D.N.Y. 2016) (emphasis and alteration in original) (internal quotation marks omitted) (quoting *Williams v. Boulevard Lines, Inc.*, 2013 WL 1180389, at *13, n. 10 (S.D.N.Y. Mar. 12, 2013)).

> While such vicarious liability does not arise from acts that are committed for the employee's personal motives unrelated to the furtherance of the employer's business, those acts which the employer could reasonably have foreseen are within the scope of the employment and thus give rise to liability under the doctrine of respondeat superior, even where those acts constitute an intentional tort or a crime[.]

*Galasso, Langione & Botter, LLP v. Galasso*, 113 N.Y.S.3d 110, 118 (N.Y. App. Div. 2019) (internal quotation marks omitted) (quoting *Holmes v. Gary Goldberg & Co.*, 838 N.Y.S.2d 105 (N.Y. App. Div. 2007)). "A necessary element of a cause of action to recover damages for negligent hiring, retention, or supervision is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Perrone v. Monroe Cnty. Sheriff Patrick O'Flynn*, 2015 WL 7776930, at *8 (W.D.N.Y. Dec. 2, 2015) (internal quotation marks omitted) (quoting *Shu Yuan Huang v. St. John's Evangelical Lutheran Church*, 12 N.Y.S.3d 232, 232 (N.Y. App. Div. 2015)).

Plaintiff alleges that "County employees and subordinates negligently disregarded

multiple rules, regulations, and protocols in the maintenance of the Chautauqua County Jail such that" the Decedent "was not sent to a hospital or provided with heightened medical care[.]" (Doc. 24 at 31-32, ¶ 110.) These Defendants were acting "in furtherance of the[ir] employer's business," *Galasso*, 113 N.Y.S.3d at 118, and within the scope of their employment. Plaintiff does not allege that these Defendants had a propensity for such conduct or that Defendants County or Quattrone were aware of any such propensity. Therefore, to the extent that Counts V and VIII are based on negligent training, supervision, and retention of subordinates, Plaintiff fails to plead a plausible cause of action against Defendants County and Quattrone.

As an alternative ground for dismissal of Count V, Defendants contend that Defendant County cannot be held vicariously liable for Defendant Quattrone's alleged negligent training and/or supervision of his deputies. "The County's duty to provide and maintain the jail building is distinguishable from defendant Sheriff's duty to 'receive and safely keep' prisoners in the jail over which he has custody[.]" *Freeland v. Erie Cnty.*, 997 N.Y.S.2d 860, 862 (N.Y. App. Div. 2014) (quoting N.Y. Correct. Law § 500-c); *Mosey v. Cnty. of Erie*, 984 N.Y.S.2d 706, 709 (N.Y. App. Div. 2014) ("The court . . . properly granted defendants' respective motions insofar as defendants asserted that they were not vicariously liable for the conduct of the deputy sheriff."). To the extent that Plaintiff's negligence claim against Defendant County relies on Defendant County's vicarious liability for Defendant Quattrone's deputies, including Defendant John Does, that claim must be dismissed. *See Villar v. Cnty. of Erie*, 5 N.Y.S.3d 747, 748 (N.Y. App. Div. 2015) (holding that a county "may not be held responsible for the negligent acts of the Sheriff and his deputies on the theory of respondeat superior, in the absence of a local law assuming such responsibility") (internal quotation marks omitted) (quoting *Marashian v. City of Utica*, 626 N.Y.S.2d 646, 647 (N.Y. App. Div. 1995)); *Busch v. Howard*, 2021 WL 2946532, at *4 (W.D.N.Y. July 14, 2021) (dismissing a negligence claim against a county based on *respondeat superior* liability because the "[p]laintiff ha[d] not alleged that [the] County . . . enacted a local law adopting *respondeat superior* liability") (quoting *DiJoseph v. Erie Cnty.*, 2020 WL 4194136, at *10 (W.D.N.Y. July 21,

2020)).

Defendants' motion to dismiss Count V against Defendant County and Count VIII against Defendant Quattrone is GRANTED.

### I.   Whether Plaintiff's Negligent Breach of a Duty to Adequately Supervise Claim is Duplicative.

Defendants argue that Count XI against Defendants Roberts, Delahoy, Burrell, Westfahl, Fuller, John Doe Jail Personnel, and John Doe Deputies for negligently breaching a duty to adequately supervise the Decedent must be dismissed as duplicative of Count V because there is no allegation that these Defendants acted outside the scope of their duties as employees of the County. Plaintiff counters that her fifth and eleventh causes of action are different because Count V asserts negligence against Defendant County with respect to its "duty to maintain the jail" and negligent training of employees (Doc. 24 at 31, ¶¶ 109-10) while Count XI alleges negligence against Defendants Roberts, Delahoy, Burrell, Westfahl, Fuller, John Doe Jail Personnel, and John Doe Deputies for their negligent supervision of the Decedent.

Plaintiff's fifth and eleventh causes of action are asserted against different defendants and allege different theories of recovery. They are therefore not duplicative, and Defendants' motion to dismiss Count XI on that ground is DENIED.

### J.   Whether Plaintiff's Medical Malpractice Claims Should be Dismissed for Procedural Noncompliance.

Under the New York Civil Practice Law Rules:

[i]n any action for medical, . . . malpractice, the complaint shall be accompanied by a certificate, executed by the attorney for the plaintiff, declaring that:

> the attorney has reviewed the facts of the case and has consulted with at least one physician in medical malpractice actions, . . . who is licensed to practice in this state or any other state and who the attorney reasonably believes is knowledgeable in the relevant issues involved in the particular action, and that the attorney has concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of such action[.]

N.Y. C.P.L.R. § 3012-a(a)(1).

Defendants argue that Plaintiff failed to file a Certificate of Merit in compliance with New York law with her Amended Complaint. Her failure to do so does not negate her malpractice claims because she filed a Certificate of Merit with her Original Complaint. *See Buchanan v. Hesse*, 2018 WL 6067234, at *3 (S.D.N.Y. Nov. 20, 2018) (denying a motion to dismiss based on "Plaintiffs' counsel provided a certificate of merit with the original complaint, which included a personal injury claim for pain and suffering. The [m]oving [d]efendants do not explain why a revised certificate is necessary here"); *Frierson v. United States*, 2019 WL 2601692, at *4 (D. Vt. June 25, 2019) (rejecting "the United States' contention that [the p]laintiff's failure to include a certificate of merit with the First Amended Complaint required dismissal of the entire complaint" because the plaintiff included the certificate of merit with original complaint and therefore the "screening process[]" was complete). Defendants' motion to dismiss Plaintiff's medical malpractice claims for failure to file a Certificate of Merit is therefore DENIED.

### K.     Leave to Amend.

Pursuant to Fed R. Civ. P. 15(a), courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R Civ. P. 15(a). However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Because at this juncture the court cannot find that any claims asserted by Plaintiff would be futile, and because there is no other ground on which to deny leave to amend,[8] Plaintiff is hereby GRANTED leave to amend within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

### CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss

---

[8] Defendants request that the court dismiss Counts VI, IX, X, XI, and XII with prejudice but do not explain why they contend that outcome is appropriate.

Counts V, VI, VIII, IX, and XII, GRANTS IN PART and DENIES IN PART
Defendants' motion to dismiss Counts VII and X and DENIES Defendants' motion to
dismiss Count IV, XI, and XIII. The court GRANTS leave to amend the Amended
Complaint within twenty (20) days of the date of this Opinion and Order.

SO ORDERED.

    Dated this 27th day of July, 2021.

Christina Reiss, District Judge
United States District Court